UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT SYMONDS,

                Petitioner,

    - against -

THOMAS GRIFFIN, Superintendent of
Green Haven Correctional Facility,

              Respondent.

**ORDER**

15 Civ. 9423 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Robert Symonds is incarcerated at Shawangunk Correctional Facility, and he has filed a pro se petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. (Petition (Dkt. No. 1-1)) Symonds was convicted in Supreme Court of the State of New York, Bronx County, of murder in the second degree, and was sentenced to 25 years to life imprisonment.

        On April 4, 2016, this Court referred Symonds' petition to Magistrate Judge Kevin Nathaniel Fox for a Report and Recommendation ("R&R"). (Order (Dkt. No. 7)) On June 21, 2018, Judge Fox issued an R&R recommending that this Court deny the petition. (R&R (Dkt. No. 25)) On August 23, 2018, Petitioner Symonds filed objections to the R&R. (Dkt. No. 29)

        For the reasons stated below, Symonds' objections will be overruled, the R&R will be adopted, and Symonds' petition will be denied.

## BACKGROUND

### I.    FACTUAL BACKGROUND[1]

On November 17, 2009, Symonds was convicted of murder in the second degree – in violation of New York Penal Law § 125.25(1) – by a jury in Supreme Court of the State of New York, Bronx County.  See People v. Symonds, 114 A.D. 3d 456 (1st Dept. 2014); (see Trial Tr. (Dkt. No. 20) at 2165-69)[2]

On the evening of February 4, 1994, Louis Moscatelli was murdered in his home at 2553 Tenbroeck Avenue, Bronx, New York, where he lived with Ralph Brown.  (R&R (Dkt. No. 25) at 1-2; Trial Tr. (Dkt. No. 18) at 51-54)[3]

Carla Ferrante, a neighbor, testified that at about 6:30 p.m. on February 4, 1994, she heard two "male" voices coming from 2553 Tenbroeck Avenue and "a lot of noise . . . [,] as if maybe furniture was being moved or things being knocked down."  (Trial Tr. (Dkt. No. 18) at 295-96, 298)  One of the voices "sounded like [the victim's] voice."  That person said, "Bob, stop hitting me . . . I'll give you whatever you want," or "I'll do whatever you want, just stop hitting me."  (Id. at 296)

---

[1]  The parties do not dispute the underlying facts.  (See Chariott Decl. (Dkt. No. 13) ¶ 4 ("the parties do not disagree as to what the pertinent facts are," but instead "disagree only on the legal significance of the facts"); compare id., Ex. A (Dkt. No. 13-1) (Pet. Appellate Division Br.) at 2-45) with id., Ex. B (Dkt. No. 13-2) (Resp. Appellate Division Br.) at 3-24)  Moreover, because the parties have not objected to Judge Fox's recitation of the facts, this Court adopts his account of the alleged facts.  See Hafford v. Aetna Life Ins. Co., No. 16 Civ. 4425 (VEC) (SN), 2017 WL 4083580, at *1 (S.D.N.Y. Sept. 13, 2017) ("The parties do not object to the Magistrate Judge's . . . recitation of the facts of this case, and the Court adopts them in full.").

[2]  The trial transcript is filed at Dkt. Nos. 18-21.

[3]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

At about 8:00 p.m., Ralph Brown discovered Moscatelli lying face down in "a lot of blood" at their home. (Id. at 59-64)  Brown checked for a pulse, but Moscatelli was dead. (Id. at 63)  Brown went to 2259 Tenbroeck Avenue – a house located two doors away – where Petitioner Symonds was staying with his father, Robert Symonds Sr.  Brown asked Symonds Sr. for permission to use Symonds' phone to call 911.  After doing so, Brown returned to his home to wait for an ambulance. (Id. at 64-65, 69)

While Brown was waiting for the ambulance, he observed Symonds Sr. and Petitioner Symonds leave their house and walk to a car. (Id. at 70)  Petitioner Symonds "was having some type of problem walking," and "had his arm around his father's shoulder." (Id. at 70-72)  Petitioner Symonds' hand was "wrapped" in "a towel or some type of cloth," as if it had been injured. (Id. at 72-73, 229-30)  Symonds Sr. was carrying a "little canvas bag" that "looked like" "something you would keep knives in when you would take them to get sharpened." (Id. at 72, 236, 277-78)  Symonds Sr. helped his son into the front seat of the car, put the canvas bag inside the car, and then entered the car. (Id. at 72, 277-78)  The two then drove away. (Id. at 72, 277-78)

Police officers arrived at 2553 Tenbroeck Avenue that evening. (See Trial Tr. (Dkt. No. 21) at 1126)  The officers noticed a "trail" of blood on the sidewalk between Moscatelli's house and Symonds' house two doors away. (Id. at 1129, 1168; id. (Dkt. No. 19) at 670-71)

On February 5, 1994 – the next day – officers collected blood samples from a cement walkway outside Petitioner's house.  Pursuant to a search warrant, police also recovered

– from a bathroom inside Petitioner's house – a bathtub mat and shower curtain that appeared to be stained with blood.[4]  (Id. (Dkt. No. 19) at 671-73)

On February 15, 1994, police recovered a glass ashtray from Moscatelli's house that appeared to have blood on it.  (Id. (Dkt. No. 21) at 1142-44)

On March 15, 1994, more blood evidence was recovered from Moscatelli's house. (Id. at 1149-57)  Three blood droplets were found on the floor of the dining room, and were marked S1, S2, and S3.  (Id. at 1156; id. (Dkt. No. 18) at 538-56 (explaining the collection process))  The droplet labeled S3 was the "most concentrated" sample.  (Id. (Dkt. No. 18) at 540)

All the blood samples were brought to the New York City Office of the Chief Medical Examiner.  (Id. (Dkt. No. 19) at 673; see Petition, Ex. B (Dkt. No. 1-2) (Singer Order) at 20 n.1)  The lab performed "enzyme" testing on this evidence.  (Singer Hearing Tr. (Dkt. No. 17) at 15-16)  Enzyme testing measures certain proteins in blood but "is not DNA based."  (Id. at 95)  Tests performed on the three blood samples recovered from Moscatelli's dining room, and the blood found on the cement walkway outside the Symonds home, were "inconclusive" as to source.  (Id. at 15, 99-102)  Tests performed on the blood found on the ashtray indicated that the source could have been the victim.  (Id. at 99-100)  The blood found on the bathtub mat and shower curtain was not the victim's blood.  (Id. at 15, 100)

---

[4]  Officers also recovered two firearms from the Symonds' residence:  a shotgun and a .25 caliber automatic pistol.  (Trial Tr. (Dkt. 19) at 672-73)  Symonds Sr. was taken into custody at the 49th Precinct and charged with criminal possession of a weapon.  (Id. at 673; id. (Dkt. No. 21) at 1160)

## II.    PRE-TRIAL PROCEEDINGS

### A.    Arrest

In 2006, Symonds was living in Orange County, Florida.  (Singer Hearing Tr. (Dkt. No. 17) at 26-27)  On June 29, 2006, the Sheriff's Office in Orange County, Florida obtained a warrant for a DNA sample from Symonds.  (Id. at 27-29)

On July 1, 2006, the Medical Examiner's lab confirmed that Symonds' DNA was consistent with the DNA profile recovered from the blood found (1) on the bathtub mat and shower curtain in the Symonds' home; (2) on the cement walkway outside the Symonds' home; and (3) in S3 – one of the blood samples recovered from Moscatelli's dining room.  (Id. at 29; Petition, Ex. B (Dkt. No. 1-2) (Singer Order) at 25-26)

The grand jury returned an indictment on August 29, 2006 that charged Petitioner with second degree murder.  (Petition, Ex. B (Dkt. No. 1-2) (Singer Order) at 26)  The indictment was filed on September 25, 2006, and Symonds was extradited to New York on October 17, 2006.  (Id.)

### B.    *Singer* Hearing

On January 2, 2008, Symonds moved to dismiss the indictment, arguing that the twelve-year delay in indicting him for the murder of Moscatelli deprived him of his rights to due process and a speedy trial under New York Criminal Procedure Law ("CPL") § 30.20.  (Petition, Ex. A (Dkt. No. 1-2) (Pet. Singer Br.) ¶¶ 4-10)

1.    **The Evidence at the *Singer* Hearing**

In January 2009, New York Supreme Court Justice Martin Marcus conducted a hearing concerning Symonds' motion to dismiss.[5]  (See Singer Hearing Tr. (Dkt. No. 17))  The People called three witnesses:  (1) retired Detective Kevin Tracy of the New York City Police Department (the "NYPD"), who had investigated the Moscatelli murder; (2) former Bronx County Assistant District Attorney ("ADA") Risa Sugarman, who was the Homicide Bureau Chief in 1994; and (3) Mark Desire, who worked at the Medical Examiner's laboratory in 1997.  (See id. at 6-161; Petition, Ex. B (Dkt. No. 1-2) (Singer Order) at 17)  Symonds did not call any witnesses at the hearing.

Although Symonds was identified in police records as a suspect in Moscatelli's murder as early as February 5, 1994 (see Petition, Ex. B (Dkt. No. 1-2) (Singer Order) at 18), he was not arrested and indicted until 2006.  (See id. at 26)

As of 1994 – when the Moscatelli murder took place – the Medical Examiner's enzyme testing technology "was capable of determining whether two or more [blood] samples were from the same donor."  (Id. at 21; see also Singer Hearing Tr. (Dkt. No. 17) at 95-97, 101-04)  For example, the enzyme testing technology was capable of determining whether Moscatelli's blood was found in the blood samples recovered from the Symonds' home.  (Singer Hearing Tr. (Dkt. No. 17) at 95-97, 101-04)  As discussed above, however, the results of the enzyme testing conducted in connection with the Moscatelli investigation were "inconclusive." (Id. at 99-101)  While more accurate DNA testing was available, such tests would be performed

---

[5]  In New York, an evidentiary hearing concerning the reasonableness of pre-indictment delay is referred to as a "Singer hearing," pursuant to People v. Singer, 44 N.Y.2d 241 (1978).

only if the lead detective asked the Medical Examiner's lab to "perform the requisite testing." (Id. at 124-25)  No such request was made in this case.  (Id. at 84, 87)

Former ADA Sugarman testified that – in 1994 – she would not have "requested" or "authorized" the expense of DNA testing in a case where there was no "target in custody or in [a known location] in New York State" whose DNA was available for comparison against evidence from the crime scene.  (Id. at 84, 87; see also id. at 96, 129 (Medical Examiner's Office assistant director Desire testifying that DNA testing was not ordered because "[t]here was no suspect at this point, no known sample"))  Even where a suspect was arrested and a DNA sample was obtained, the results of DNA testing took "more than a month."  (Id. at 74)  Accordingly, DNA results "would not have been available in time for presentment to the grand jury, or at a felony hearing before the defendant would have had to have been released pursuant to CPL § 180.80."[6]  (Petition, Ex. B (Dkt. No. 1) (Singer Order) at 20, 32; see Singer Hearing Tr. (Dkt. No. 17) at 74)

Sugarman further testified that in July 1994 the lead detective sought authorization from the Bronx County District Attorney's Office to arrest Symonds, but Sugarman denied the request.  (Singer Hearing Tr. (Dkt. No. 17) at 70)  Given the inconclusive nature of the lab report, there did not appear to be enough evidence against Symonds to obtain an indictment.  (Id.)  The case remained open for further investigation.

In 1998, the Medical Examiner's policy regarding DNA testing began to change. (Id. at 107-08)  With technological advances, the lab was able to build "more unique [DNA] profiles" (id. at 106), and given newly compiled DNA databases, the lab could compare evidence

---

[6]  CPL § 180.80 requires that, absent an indictment, a court must release a defendant who has been held in custody on a felony complaint for more than 120 hours "without . . . a disposition." N.Y. Crim. Proc. Law § 180.80.

from crime scenes against offender profiles in local and national databases.  (Id. at 105-08, 130)
These "more established" DNA testing techniques enabled the Medical Examiner's Office to
identify perpetrators even where a suspect had not been identified, and to build a DNA profile
within "a quicker turn around time."  (Id. at 106)  Evidence samples obtained prior to 1998,
however – such as the blood samples at issue here – would only be submitted for the new DNA
testing "at the request of the prosecutor or case detective."  (Id. at 138)  Detective Tracy testified
that, between June 1994 and December 2005 – when he began working on the case – there was
no request for DNA testing.  (Id. at 45-50)  There was also no "policy" in place at the Medical
Examiner's Office as to the circumstances in which new DNA testing would be conducted as to
"previously untested physical evidence."  (Id. at 133-39)

      In 2005, Detective Tracy asked Mark Desire of the Medical Examiner's Office to
perform DNA analysis of the three blood samples (S1, S2, and S3) collected from Moscatelli's
home in 1994.  (Id. at 16-17; id. at 109-10)  And on June 1, 2006, Tracy asked Desire to analyze
other blood samples related to the Moscatelli murder that had been collected in 1994.  (Id. at
112-15)  On June 22, 2006, Desire told Detective Tracy that DNA testing indicated that the
blood samples taken from the bathtub mat, the shower curtain, and the cement walkway, and the
blood sample marked as S3 –  one of the droplets of blood found in Moscatelli's dining room –
all came from the same unknown male donor.  (Id. at 117)

      Tracy then reviewed the NYPD's original investigative reports ("DD-5's")
concerning the Moscatelli murder, the related NYPD vouchers, and the lab reports.  He also
ascertained the locations of Petitioner Symonds and the two witnesses who had been interviewed
in 1994 – Moscatelli's roommate Ralph Brown and his neighbor Carla Ferrante.  (Id. at 18-21)
Tracy re-interviewed the two witnesses; their statements in 2006 were consistent with their

statements in 1994.  (Id. at 18-19)  After locating Symonds in Florida, Tracy obtained a warrant

for his DNA sample on June 29, 2006.  (Id. at 27-29)

On July 1, 2006, Desire confirmed that Symonds' DNA was consistent with the

DNA found in the blood samples taken from the bathtub mat, the shower curtain, and the cement

walkway, and contained within S3.  (Id. at 118-19; Petition, Ex. B (Dkt. No. 1-2) (Singer Order)

at 25-26)  On August 29, 2006, the People obtained an indictment charging Symonds with

murder in the second degree.  (Petition, Ex. B (Dkt. No. 1-2) (Singer Order) at 26)

### 2.    Symonds' Arguments at the *Singer* Hearing

At the Singer hearing, Symonds argued that the twelve-year delay in obtaining an

indictment was unjustified and unreasonable, and that he was prejudiced by the delay.  (Petition,

Ex. A (Dkt. No. 1-2) (Pet. Singer Br.) ¶¶ 15-22)

In arguing that the delay was unreasonable, Symonds asserted that – in the

intervening twelve years – "no additional evidence and no new witnesses [had been discovered]

in addition to those available" in 1994.  (Id. ¶¶ 15, 17-18)  Moreover, the Medical Examiner's

lab could have performed DNA testing in 1994, and the results would have been the same as

those obtained in 2006.  (See id. ¶¶ 16-18)  According to Symonds, the failure to conduct DNA

testing in 1994 was the result of police and prosecutorial "negligence" (id. ¶¶ 22), and thus there

was no good cause for the People's failure to "initiate[] criminal proceedings" in 1994.  (Id. ¶¶

13-14, 18)

As to prejudice, Symonds argued that the death of his father in 1997 deprived him

of a witness who would have been available to testify if the case had been timely prosecuted.

(Id. ¶ 19)  While Symonds did not allege the testimony his father would have given, he attached

an NYPD DD-5 report summarizing a statement his father gave to the police on February 10,

1994:

> On February 10, 1994, at approximately 1745 hours, [Detective Guedes] together with Lt. Mercado and Det's Lugo and Wellock were present in front of 2559 Tenbroeck Ave. when Mr. Symonds pulled up in his station wagon. . . . [Detective Guedes] asked Mr. Symonds if he heard from his son, Robert Jr. He said yes, early Tuesday, February 8, 1994, and said he couldn't talk much he was in a hurry. He said that he was inside 2553 Tenbroeck Ave. when Louis [Moscatelli] was stabbed, it was dark and there were three other guys there. He said he was cut on the fingers, hand and leg. He ran out and hid behind his father's car.

(See Chariott Decl., Ex. 1 (Dkt. No. 13-1) (Pet. Appellate Division Br.) at 35 (quoting <u>Singer</u> Hearing Tr., Ex. G))[7]

### 3.    <u>The State Court's Decision Denying Symonds' Motion to Dismiss</u>

In a February 24, 2009 order, Supreme Court Justice Marcus concluded that the twelve-year delay did not prejudice Petitioner's defense. (Petition, Ex. B (Dkt. No. 1-2) (<u>Singer</u> Order) at 31) "Although the amount of evidence did not change between Ms. Sugarman's review in 1994 and the decision to charge [Symonds] in 2006, a denial of due process is not established merely because two prosecutors made different decisions based on the same, or virtually the same, evidence." (<u>Id.</u>) (citing <u>People v. Denis</u>, 276 A.D. 2d 237, 248 (3d Dept. 2000) (six-year pre-indictment delay was justified even if decision to charge was based on "evidence which was largely available years earlier"); <u>see also</u> <u>People v. LaRocca</u>, 172 A.D. 2d 628, 628 (2d Dept. 1991) (seventeen-year delay was permissible because original prosecutor had "a good-faith basis to believe [that the People] lacked sufficient evidence to successfully prosecute [the] defendant during this period").

---

[7]  The parties have not provided a copy of the DD-5, but excerpts from this report are set forth in the brief Petitioner filed in connection with his direct appeal to the Appellate Division, First Department (<u>see</u> Chariott Decl., Ex. 1 (Dkt. No. 13-1) (Pet. Appellate Division Br.) at 35), and Respondent has not disputed the accuracy of these excerpts.

In determining whether Symonds was denied his due process right to a prosecution that was promptly initiated, Justice Marcus considered the factors set forth in <u>People v. Taranovich</u>, 37 N.Y.2d 442 (1975):

> (1) the extent of the delay; (2) the nature of the underlying charge; (3) whether there has been an extended period of pre-trial incarceration; (4) whether the defense has been prejudiced by the delay; and (5) the reason for the delay.

(Petition, Ex. B (Dkt. No. 1-2) (<u>Singer</u> Order) at 27) (citing <u>Taranovich</u>, 37 N.Y.2d at 445) While acknowledging that the twelve-year delay was "protracted and extraordinary" (<u>id.</u> at 28), Justice Marcus found that the other <u>Taranovich</u> factors favored the People.  (<u>Id.</u> at 28-33)

As to the nature of the charge, Justice Marcus noted that it was murder, was therefore "grave" (<u>id.</u> at 28), and required that he "proceed with far more caution and deliberation." <u>See Taranovich</u>, 37 N.Y.2d at 446.  As to pre-indictment incarceration, Justice Marcus noted that Symonds had been arrested on June 30, 2006, and indicted on September 25, 2006, and that the three-month period of pre-indictment incarceration did not present an issue. (Petition, Ex. B (Dkt. No. 1-2) (<u>Singer</u> Order) at 28)

As to prejudice, Justice Marcus found that Symonds "has made no specific showing that his defense has been harmed by the delay." (<u>Id.</u> at 28-29)  Symonds' "'routine-like claim[s] of prejudice'" that an unnamed exculpatory witness and unidentified "information" might have been available closer to the date of the crime were merely speculative, because Symonds did not explain how such evidence "might have proved helpful to his defense." (<u>Id.</u> at 29-30) (quoting <u>People v. LaRocca</u>, 172 A.D. 2d 628 (2d Dept. 1991))  To the extent that Symonds claimed that his father was "a potential witness," he "fail[ed] to specify what testimony his father might have been able to offer." (<u>Id.</u> at 29)  Assuming that his father's February 10, 1994 statement to Detective Guedes was admissible, "copies of [the DD-5 reflecting that

statement were] in defense counsel's possession," and could be introduced at trial subject to the rules of evidence.  (Id. at 29-30)

As to the reason for the delay, Justice Marcus found that – in 1994 – it was a "legitimate exercise of prosecutorial discretion" "not to conduct DNA testing in the absence of a suspect's known sample," given the delay associated with DNA analysis at that time and the indefinite nature of the results that that analysis yielded in 1994.  (Id. at 32)  By contrast, in 2006, the prosecutor "knew that once a DNA sample was obtained from the defendant, it would be tested expeditiously and there would be definitive proof that the defendant either was or was not the donor of the blood."  (Id. at 32-33)  These "advancements in the scientific testing of physical evidence and the ability to develop a DNA profile within a shorter period of time" allowed the People to "accomplish[] in 2006 [what] was not possible in 1994."  (Id. at 26-27)

While Justice Marcus acknowledged that the Medical Examiner's policies regarding DNA testing changed as early as 1998, he concluded that "neither [the prosecutor and] the police, nor the Medical Examiner's [lab] acted in bad faith, particularly given the volume of unsolved homicide cases in New York City."  (Id. at 33)

In sum, Justice Marcus ruled that the twelve-year delay in charging Symonds did not prejudice his defense, that the delay resulted from a legitimate exercise of prosecutorial discretion, and that Symonds was not entitled to a dismissal of the indictment.  (Id. at 33-34)

## III.    TRIAL AND SENTENCING

Supreme Court Justice Peter J. Benitez presided over Symonds' 18-day trial in September and October 2009.  (See Trial Tr. (Dkt. No. 18) at 7-8)

The testimony at trial included testimony from Moscatelli's neighbor, Carla Ferrante, who testified that she overheard Moscatelli say, "Bob, stop hitting me . . . I'll give you whatever you want," less than two hours before his body was found.  (Id. (Dkt. No. 18) at 296)

A Rikers Island inmate who had been incarcerated with Symonds in July and August 2009 testified that they had had many discussions about the murder Symonds was charged with.  (Id. (Dkt. No. 21) at 1498)  Symonds told his fellow inmate that he was "involved in the murder" of a "victim[] name[d] Louis" in 1994, and that the murder "happened because [Symonds] owed his father money," with the implication that the father was pressuring Symonds to repay the debt.  (Id. at 1628-29)  Symonds told the inmate that he thought that he could "get away with [the murder,] because the case was so old," and because Symonds had "left [the murder scene] before the cops even got there."  (Id. at 1506, 1628)  The inmate testified that the two had repeatedly discussed Symonds' case because Symonds had asked for help in "see[ing] what the flaws were [in] his case."  (Id. at 1500)

The People also introduced evidence demonstrating that a drop of Symonds' blood had been found in Moscatelli's home shortly after Moscatelli had been found stabbed to death there.  (Id. (Dkt. No. 20) at 1736-44, 1988-96)  The People's theory at trial was that Moscatelli had been the victim of a violent, vicious assault in which there had been a struggle, and during which Symonds had stabbed Moscatelli forty-nine times.  (Id. at 1988-89)  The People asserted that a drop of Symonds' blood had been found in Moscatelli's dining room because Symonds had accidentally cut himself during the assault.  (Id.)  The People argued that "there is no innocent explanation for Symonds' blood to be present in [] Moscatelli's house other than he is a murderer."  (Id. at 1995)

The jury heard evidence that a great deal of blood had been observed in Moscatelli's home near his body; that police had observed a trail of blood on a cement walkway running from Moscatelli's house to the Symonds' house two doors away; and that blood had

been observed on a bathtub mat and shower curtain in Symonds' bathroom. (<u>Id.</u> (Dkt. No. 19) at 670-73, 1129-1157)

Medical Examiner's Office Assistant Director Desire and NYPD Detective Tracy provided substantially the same testimony at trial as they had offered at the <u>Singer</u> hearing. Desire testified that DNA testing indicated that Symonds' DNA was consistent with (1) S3, the blood droplet found in Moscatelli's dining room; (2) the blood found on the cement walkway; and (3) the blood found on a bathtub mat and a shower curtain in Symonds' bathroom. (<u>Id.</u> at 884, 1090)

S3 – the blood droplet found in Moscatelli's dining room – was introduced at trial in its "original packaging." (<u>Id.</u> (Dkt. No. 20) at 1787) The People also introduced a photograph of the blood droplet at the time it was collected by the NYPD's Crime Scene Unit in Moscatelli's dining room. (<u>Id.</u> at 1736-44) Desire testified that the S3 blood sample was in the shape of a blood "drop," and not in the shape of a blood "smear." (<u>Id.</u> at 1156; <u>id.</u> at 899 (Desire testifying that S3 "appears to be a drop as oppose[d] to [a] contact pattern," which occurs when "two objects come into contact with each other and create[e] a smear"); <u>id.</u> (Dkt. No. 18) at 538-56 (NYPD Detective Signorelli explaining the collection process)) NYPD Detective Andrew Lugo testified that the shape of the S3 sample "would indicate that somebody bled at that particular spot" in Moscatelli's dining room, and not that the blood droplet was deposited later as a result of police contamination. (<u>Id.</u> (Dkt. No. 19) at 821-22)

James Gill – a deputy chief examiner at the Medical Examiner's laboratory – testified that the forensic evidence indicated that Moscatelli had "struggle[d]" with his killer. (<u>Id.</u> at 972) Gill found forty-nine stab wounds on Moscatelli's body, including six lacerations on his scalp and forehead, a six-inch cut across his neck, and defensive wounds to his arms and

hands.  Moscatelli had also suffered a fractured rib.  (Id. at 950-86)  Gill further testified that

those who stab a victim more than forty times "often" "end up cutting themselves during the

assault," and leaving behind droplets of their own blood at the crime scene.  (Id. at 975-76, 978)

Moscatelli's roommate Ralph Brown testified that after discovering Moscatelli's

body – and while waiting for an ambulance – he saw Symonds and his father leave their house

and walk to their car.  (Id. (Dkt. No. 18) at 70)  Symonds was "having some type of problem

walking," and he had "a towel or some type of cloth" wrapped around his hand, suggesting an

injury.  (Id. at 72-73, 229-30)  Symonds Sr. was carrying the type of "little canvas bag" in which

"knives" are commonly stored.  (Id. at 72, 236, 277-78)

The defense theory at trial was that the police officers who had entered Symonds'

residence had tracked Symonds' blood from that location – or from the walkway – into

Moscatelli's house.  In support of this theory, defense counsel elicited from NYPD Detective

Michael Guedes – the detective initially assigned to investigate the Moscatelli murder – that the

officers who had reported to the murder scene were not wearing protective gear or footwear

when they entered the two homes.  (Id. (Dkt. No. 21) at 1185-87; see also id. (Dkt. No. 18) at

426-27 (Crime Scene Unit Detective Francis Harten testifying that the NYPD had "[v]ery limited

resources" in the area of protective clothing and footwear))

Symonds did not testify, but he called forensic expert George Shiro and DNA

expert Heather Coyle.  Both defense experts testified that the blood evidence at the crime scene

was "poorly managed" and "poorly processed."  (Id. (Dkt. No. 21) at 1340-1346; see also id. at

1663-64) (Coyle testifying that while 1994 records state that S3 – a drop of blood found in the

victim's house – had been collected on "a gauze pad," in 2005, S3 was described as a drop of blood collected on a "cotton tip swab"))[8]

On October 22, 2009, the jury returned a verdict convicting Symonds of murder in the second degree.  (Id. (Dkt. No. 20) at 2165-69)

On November 17, 2009, Justice Benitez sentenced Symonds to 25 years to life imprisonment.  See People v. Symonds, 114 A.D. 3d 456 (1st Dept. 2014).

## IV.    POST-TRIAL PROCEEDINGS

### A.    Direct Appeal

In July 2012, Symonds filed an appeal with the Appellate Division, First Department.  (See Chariott Decl., Ex. 1 (Dkt. No. 13-1) (Pet. App. Div. Br.))  On direct appeal, Symonds argued that (1) he had been deprived of his right to due process as a result of the twelve-year delay between the Moscatelli murder and his indictment; and (2) the evidence was not sufficient to prove his guilt beyond a reasonable doubt.  (Id. at 7)  According to Symonds, the "only evidence that connected [him] to the crime scene" was the exhibit marked as S3 at trial, "a small sample of blood discovered just inside [the victim's] front door."  (Id. at 82)  Symonds argued that the presence of his blood in the victim's house "was the result of accidental contamination of the crime scene by police personnel, who tramped through both [his] father's house and the [victim's] house after the crime occurred."  (Id. at 83)

On February 6, 2014, the First Department unanimously affirmed Symonds' conviction.  People v. Symonds, 114 A.D. 3d 456 (1st Dept. 2014).  The court found that "[t]he

_____

[8]  Desire was recalled in the People's rebuttal case.  He brought S3 to court in its "original packaging" – that is, a "coin envelope that the gauze was placed into and then delivered to the Medical Examiner's Office."  (Trial Tr. (Dkt. No. 20) at 1736-44)  Desire testified that he was "mistaken[]" when he previously identified "samples S-1, S-2, and S-3 as cotton swabs.  In fact, they were gauzes."  (Id. at 1745-46)

verdict was based on legally sufficient evidence," and that Symonds' "assertion that the DNA

evidence against him could have been the product of crime scene contamination is speculative."

Id.  The court also found that – even assuming the DNA evidence had been contaminated –

"there was additional circumstantial evidence connecting defendant to the crime."  Id.

As to the twelve-year pre-indictment delay, the First Department concluded that

the pre-indictment delay "was sufficiently explained and [that] it was a permissible exercise of

prosecutorial discretion [not to seek earlier DNA analysis of the blood evidence]."  Id. (citing

People v. Decker, 13 N.Y. 3d 12 (2009)).

On August 28, 2014, the New York Court of Appeals denied leave to appeal.  See

People v. Symonds, 23 N.Y.3d 1068 (2014).

B.    **CPL § 440.10 Motion to Vacate the Conviction**

On March 14, 2013, Symonds moved pro se to vacate his conviction pursuant to

New York Criminal Procedure Law ("CPL") § 440.10(1)(g) and (h).  Symonds argued that he

was entitled to a new trial because of (1) newly discovered evidence; and (2) trial counsel's

failure to obtain and use at trial the alleged newly discovered evidence.  (Chariott Decl., Ex. 6

(Dkt. No. 13-7) (Pet. 440.10 Br.) at 1-3, 8-9)

The "newly discovered evidence" cited by Symonds was a December 1, 1996

"[a]ccreditation report" concerning the New York City Police Department (NYPD) laboratory.

(Petition, Ex. C (Dkt. No. 1-2) at 59-66 to (Dkt. No. 1-3) at 1-5 (1996 Accreditation Report))

The December 1, 1996 report was prepared by four "private consultants" who conducted a five-

day inspection of the NYPD laboratory.  (Chariott Decl., Ex. 9 (Dkt. No. 13-11) (Section 440.10

Order) at 3)  The consultants assessed the NYPD laboratory's procedures and recommended

certain improvements, including that the lab should "implement DNA analysis."  (Petition, Ex. C

(Dkt. No. 1-2) (1996 Accreditation Report) at 63) (noting that "DNA service is already provided in NYC by the Medical Examiner's Office in homicide cases")

Symonds argued that the 1996 accreditation report "contains highly beneficial information" that could have "discredit[ed] the testimony" of the law enforcement witnesses at trial (Chariott Decl., Ex. 6 (Dkt. No. 13-7) (Pet. 440.10 Br.) at 1), and that his lawyer's failure to obtain and use the accreditation report amounts to ineffective assistance of counsel. (Id. at 3, 5-9)

Justice Benitez denied Symonds' CPL § 440.10 motion on September 3, 2013 (see Chariott Decl., Ex. 9 (Dkt. No. 13-11) (440.10 Order)), noting that the 1996 accreditation report cited by Symonds evaluates the NYPD laboratory and not the Medical Examiner's laboratory, which is a separate entity. Justice Benitez points out that "[t]here is no indication in the trial record that serological evidence [in this case] was ever sent to the NYPD Laboratory for storage or analysis." (Id. at 4) The blood evidence was instead delivered to the Office of the Medical Examiner, which is "an independent agency that is not part of the NYPD [laboratory]." (Id.) Any report concerning the NYPD laboratory has "absolutely nothing to do with the procedures of the [Medical Examiner]." (Id.)

As to Symonds' ineffective assistance of counsel claim, Justice Benitez found that Symonds' lawyer at trial had "clearly provided [Symonds] with meaningful and effective representation." (Id. at 5-7) Defense counsel "mounted an aggressive, robust[,] and detailed attack on the serological evidence," including the officers' alleged failure to "preserv[e] the crime scene." (Id. at 5-6) While the jury decided to "credit[] the prosecution's evidence that defendant's DNA did match crucial DNA evidence extracted from the crime scene," Symonds' "trial counsel clearly provided [him] with meaningful and effective representation." (Id. at 6-7)

18

On November 4, 2013, the New York Court of Appeals denied leave to appeal. (Chariott Decl., Ex. 10 (Dkt. No. 13-12))

**C.    Habeas Corpus Petition**

On November 30, 2015, Symonds filed the instant pro se petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.[9] (Petition (Dkt. No. 1-1))  In his petition, Symonds raises the same issues set forth in his direct appeal and in his CPL § 440.10 motion:  (1) the twelve-year pre-indictment delay; (2) insufficiency of the evidence at trial; and (3) ineffective assistance of counsel.  His brief accompanying the petition repeats verbatim the arguments he raised in his direct appeal and in his CPL § 440.10 motion.  (See id.)

On April 4, 2016, this Court referred Symonds' petition to Judge Fox for an R&R. (Order (Dkt. No. 7))

**1.    Judge Fox's R&R**

On June 21, 2018, Judge Fox issued an R&R recommending that this Court deny Symonds' petition in its entirety.  (R&R (Dkt. No. 25) at 19)

As for the twelve-year pre-indictment delay, Judge Fox finds that "Symonds failed to demonstrate a violation of due process," because (1) the prosecution "fulfilled its burden of proving" that the decisions prosecutors made did not reflect "a conscious effort to gain

---

[9]  As to the timeliness of Symonds' petition, the Antiterrorism and Effective Death Penalty Act's one-year statute of limitations began to run after "the date on which the [underlying state court] judgment [became] final by the conclusion of direct review."  28 U.S.C. § 2244(d)(1)(A); see Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000).  Symonds' direct appeal was resolved on November 27, 2014, when the New York Court of Appeals denied Symonds' application for leave to appeal.  Symonds filed the instant petition on November 25, 2015 (Petition (Dkt. No. 1) at 15), by delivering the petition "to prison officials for forwarding to the [district] court clerk." Fernandez v. Artuz, 402 F.3d 111, 114 (2d Cir. 2005) (discussing the "prison mailbox rule"). Accordingly, Symonds' petition was timely filed within the one-year limitations period.  (See R&R (Dkt. No. 25) at 4 n.14)

a tactical advantage"; and (2) Symonds had not shown that "he was prejudiced by the delay."
(Id. at 15-16)  Accordingly, Judge Fox concludes Symonds is not entitled to habeas relief on this
ground.

As to Symonds' insufficiency argument, Judge Fox cites, inter alia, "the presence
of the [P]etitioner's blood in the victim's home," and the testimony of Ferrante and Brown.  (Id.
at 17)  Judge Fox concludes that "a rational trier of fact could have found the essential elements
of the crime with which Symonds was charged, beyond a reasonable doubt."  (Id.)

As to Symonds' ineffective assistance of counsel claim – which is premised on
his lawyer's failure to obtain and use the 1996 NYPD laboratory accreditation report – Judge
Fox rejects Symonds' argument, stating that Symonds has "failed to establish that trial counsel's
performance fell below an objective standard of reasonableness and that he suffered prejudice as
a result."  (Id. at 18)

The R&R notifies the parties that, "[p]ursuant to 28 U.S.C. § 636(b)(1) and Rule
72(b) of the Federal Rules of Civil Procedure," they "have fourteen (14) days from service of
[his] Report to file written objections."  (Id. at 19)  The R&R further states that a "failure to
object within fourteen (14) days will result in a waiver of objections and will preclude appellate
review."  (Id.) (emphasis omitted) (citing Thomas v. Arn, 474 U.S. 140 (1985); Cephas v. Nash,
328 F.3d 98, 107 (2d Cir. 2003))

On June 21, 2018, Judge Fox's Chambers mailed the R&R to Symonds.  (See
June 21, 2018 Minute Entry (Docket Report for 15 Civ. 9423))  In a July 9, 2018 letter, Symonds
requests an extension of time to August 21, 2018 to file objections to the R&R.  (Symonds July
9, 2018 Ltr. (Dkt. No. 28) at 2)

Although Symonds' request for an extension of time was filed outside the 14-day limit, Respondent has not argued that Symonds' objections are untimely, and has chosen to address his objections on the merits. Accordingly, this Court will do likewise.

## 2. **Petitioner's Objections**

Symonds filed his objections to the R&R on August 17, 2018. (See Pet. Obj. (Dkt. No. 29)) All of his objections are premised on the People's twelve-year delay in bringing a murder charge against him.[10] Symonds contends that this pre-indictment delay violated his constitutional right to due process under the Fifth Amendment.

In arguing that Judge Fox erred in finding that the pre-indictment delay "was satisfactorily explained and was a permissible exercise of prosecutorial discretion" (id. at 4), Symonds points out that – while ADA Sugarman testified that her office "lack[ed] sufficient evidence" to prosecute Symonds in 1994 (id. at 6, 11-12) – the prosecution did not offer any "new evidence" or "new witnesses" when he was charged in 2006. (Id. at 8) (arguing that the prosecution was "grounded on the same factual allegations that were heard, considered[,] and decided in 1994") According to Symonds, any "DNA results . . . ha[d] already been known . . . in 1994." (Id. at 13) Accordingly, the People did not justify the twelve-year delay in bringing a murder charge against Symonds, and his Fifth Amendment due process rights were violated.

## DISCUSSION

## I. LEGAL STANDARDS

### A. Review of a Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

---

[10] Symonds does not object to Judge Fox's findings concerning his sufficiency of the evidence arguments and his ineffective assistance of counsel claim.

magistrate judge."  28 U.S.C. § 636(b)(1)(C).  Where a timely objection has been made to a

magistrate judge's recommendation, the district judge "shall make a de novo determination of

those portions of the report or specified proposed findings or recommendations to which

objection is made."  Id.

However, "[o]bjections that are 'merely perfunctory responses argued in an

attempt to engage the district court in a rehashing of the same arguments set forth in the original

[papers] will not suffice to invoke de novo review.'"  Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d

201, 211 (S.D.N.Y. 2013) (quoting Vega v. Artuz, No. 97 Civ. 3775 (LTS) (JCF), 2002 WL

31174466, at *1 (S.D.N.Y. Sept. 30, 2002)).  "To the extent . . . that the [objecting] party makes

only conclusory or general arguments, or simply reiterates the original arguments, the Court will

review the [R&R] strictly for clear error."  IndyMac Bank, F.S.B. v. Nat'l Settlement Agency,

Inc., No. 07 Civ. 6865 (LTS) (GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008).

Although "[t]he objections of parties appearing pro se are generally accorded

leniency and should be construed to raise the strongest arguments that they suggest . . . [,] even a

pro se party's objections to a[n] [R&R] must be specific and clearly aimed at particular findings

in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply

relitigating a prior argument."  DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 340 (S.D.N.Y.

2009) (citations and quotation marks omitted).

**B.    Habeas Review**

When reviewing a petition for habeas relief from a state court judgment, the

Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2254(d),

requires federal courts to give deference to state court decisions on the merits.  See Harrington v.

Richter, 562 U.S. 86, 101 (2011) ("A state court must be granted a deference and latitude that are

not in operation when the case involves [direct] review [of a criminal conviction].").

Section 2254(d) provides that

[a]n application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Bell v. Miller, 500 F.3d 149, 154-55 (2d Cir. 2007) (same).

The Supreme Court has emphasized that, "[f]or purposes of § 2254(d)(1), 'an

unreasonable application of federal law is different from an incorrect application of federal

law.'" Harrington, 562 U.S. at 101 (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)

(emphasis in Williams)). "A state court's determination that a claim lacks merit precludes

federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state

court's decision." Id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a

state prisoner must show that the state court's ruling on the claim being presented in federal court

was so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility for fairminded disagreement." Id. at 103. This high standard

"reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state

criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. at

102-03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979)).

Here, Symonds repeats the same arguments he made in his direct appeal. The First Department addressed Symonds' arguments on the merits, and its determinations are entitled to deference. See Friedman v. Rehal, 618 F.3d 142, 153 (2d Cir. 2010) (explaining that the standard of review for state court decisions under § 2254(d) – "'[u]nreasonable application of[] clearly established Federal law'" – is even more deferential than "clear error" review) (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)).

## V.    ANALYSIS

### A.    Pre-Indictment Delay

Symonds argues that the indictment should have been dismissed because of the twelve-year delay between Moscatelli's murder and the murder charge brought against him. (Petition, Ex. A (Dkt. No. 1-1) (Pet. Br.) at 50-69)  Judge Fox concludes that Symonds "failed to demonstrate a violation of due process as a result of the delay."  (R&R (Dkt. No. 25) at 15)

As Judge Fox correctly notes (see id. at 14-15), pre-indictment delay is evaluated under the due process clause of the Fifth Amendment. See United States v. Marion, 404 U.S. 307, 324-26 (1971). In order to prevail on his due process claim, Symonds must show that the pre-indictment delay (1) "caused substantial prejudice" to his right to a fair trial; and (2) "was an intentional device [used by the prosecution] to gain [a] tactical advantage over [him]." Id. at 324; see United States v. Cornielle, 171 F.3d 748, 752 (2d Cir. 1999) (emphasizing that these requirements are conjunctive). A habeas petitioner making such a claim bears a "heavy burden." United States v. Elsbery, 602 F.2d 1054, 1059 (2d Cir. 1979).

A habeas petitioner may demonstrate "prejudice" "by [showing] the loss of documentary evidence or the unavailability of a key witness." Cornielle, 171 F.3d at 752. The alleged lost evidence or testimony "must[, however,] be definite and not speculative." United

States v. Birney, 686 F.2d 102, 106 (2d Cir. 1982); see United States v. Wey, No. 15-CR-611 (AJN), 2017 WL 237651, at *14 (S.D.N.Y. Jan. 18, 2017) (same).

In conducting the due process analysis, courts "presume" that prosecutions brought within the statute of limitations do not prejudice the defendant, because "the applicable statute of limitations . . . is . . . the primary guarantee against bringing overly stale criminal charges." Marion, 404 U.S. at 322 (citing United States v. Ewell, 383 U.S. 116, 122 (1966)); see also Georgison v. Donelli, No. 04 Civ. 1444 (DC), 2005 WL 1384015, at *7 (S.D.N.Y. June 9, 2005), aff'd, 588 F.3d 145 (2d Cir. 2009) ("If the indictment is brought within the applicable statute of limitations, there is a presumption that the defendant was not prejudiced."). Given that there is no statute of limitations in New York for second degree murder, see CPL § 30.10(2)(a), Symonds' indictment has a strong presumption of validity. Salcedo v. Phillips, No. 04 Civ. 7964 (PAC) (GWG), 2005 WL 2211318, at *17 (S.D.N.Y. Sept. 13, 2005) (habeas case involving a sixteen-year pre-indictment delay and a charge of second degree murder; noting that "the law presumes" "there has not been prejudice"). Indeed, indictments for second degree murder are "only rarely dismissed" on grounds of pre-indictment delay. Cornielle, 171 F.3d at 752.

Here, the trial court and the First Department found that Symonds had not shown prejudice, because he had not specified the evidence that was lost as a result of the pre-indictment delay. (Petition, Ex. B (Dkt. No. 102) (Singer Order) at 28-29; Symonds, 114 A.D.3d at 979 (finding "unpersuasive" Symonds' claim of prejudice). As discussed above, a habeas petitioner bears a "heavy burden" in attempting to show actual prejudice, Elsbery, 602 F.2d at 1059, and must offer "definite and not speculative" proof of how lost evidence or testimony prejudiced the outcome of his case. Birney, 686 F.2d at 106.

In attempting to meet this standard, Symonds argues that the prosecution's delay in seeking charges deprived him of a potential witness – his father – who died in 1997. (Petition, Ex. A (Dkt. No. 13-1) (Pet. Br.) at 67 (asserting that Symonds' "father[] . . . may well have had relevant information about the incident that might have exculpated [Symonds]") Symonds contends that his father's February 10, 1994 statement to Detective Guedes indicates that there were "three potential witnesses who were in the victim's home" at the time of the murder, and that these witnesses "would [now] be very difficult . . . to locate." (Id. at 66, 67)

Symonds does not say what the three witnesses' testimony would have been, however, and "[m]erely asserting missing witnesses . . . is not enough to show actual prejudice." Georgison, 2005 WL 1384015, at *7 (finding that petitioner had not shown prejudice flowing from the absence of "two key witnesses" at trial," because he had not provided "any details about the witnesses [or] the evidence they might provide"); United States v. Rubin, 609 F.2d 51, 66 (2d Cir. 1979) ("missing peripheral witnesses are not enough" to show actual prejudice), aff'd, 449 U.S. 424 (1981). Nor has Symonds explained how testimony from these witnesses would have been exculpatory. See Salcedo, 2005 WL 2211318, at *17 (concluding that petitioner had not shown prejudice where he had "not . . . specif[ied] how any potential testimony from [a witness who died a year before his arrest] would have exculpated him"), report and recommendation adopted, No. 04 Civ. 7964 (PAC), 2007 WL 3097208 (S.D.N.Y. Oct. 22, 2007). Moreover, given that Symonds' father – in his statement to Detective Guedes – purports to be recounting what Symonds told him about what happened in Moscatelli's home on the night of the murder – Symonds is in a position to offer specifics about what the three witnesses would have said, but he has not done so. (See R&R (Dkt. No. 25) at 16) ("[I]t appears that Symonds himself was the

source of the alleged exculpatory statements.")  In sum, Symonds' claim of prejudice is entirely
speculative.

Symonds has also not shown that the pre-indictment delay "was an intentional
device [for the People] to gain [a] tactical advantage."  Marion, 404 U.S. at 324; see Denis v.
Upstate Corr. Facility, 361 F.3d 759, 760 (2d Cir. 2004) (articulating the same standard).

As an initial matter, Symonds does not even argue that the pre-indictment delay
was "an intentional device" used by the People to obtain a tactical advantage over him.  See
Marion, 404 U.S. at 324.  He instead accuses the prosecution of "negligence."  (Petition, Ex. A
(Dkt. No. 13-1) (Pet. Br.) at 1 (stating that it is a "reasonable conclusion that the [twelve-]year
delay in prosecuting this case resulted from simple negligence"); see id. at 5 ("[T]he only
feasible explanation for the failure to perform DNA testing in this case is simple negligence
arising from apparent ignorance."); id. at 76 (the "most generous explanation [for the delay] is
negligence"))  Courts in this Circuit have ruled, however, that simple negligence does not
provide a basis for a due process claim.  See, e.g., United States v. Lai Ming Tanu, 589 F.2d 82,
89 (2d Cir. 1978) (rejecting petitioner's due process claim because there was no "proof that the
[pre-indictment] delay was intentional on the part of the Government"; stating that "there was
nothing sinister about the [prosecutors'] breakdown in communications [causing the delay]");
Velez v. Lee, No. 10-CV-3402 (PKC), 2017 WL 1288663, at *7 (E.D.N.Y. Apr. 6, 2017)
(rejecting petitioner's due process claim where his allegations, "at most, demonstrate[]
negligence" by prosecutors); United States v. McGeough, No. 82 Cr. 327-11 (CPS), 1992 WL
390234, at *6 (E.D.N.Y. Dec. 8, 1992) ("there is simply no evidence demonstrating that the
passivity" – which may "amount to negligence" – "proves the government intent to delay").

Even if prosecutorial negligence could provide a basis for a due process claim, this Court agrees with Judge Fox that there is "no evidence . . . that the case was neglected." (R&R (Dkt. No. 25) at 16)  At the <u>Singer</u> hearing, Sugarman and Desire testified that in 1994 – when the Moscatelli murder took place – there was a policy not to order DNA testing unless there was a suspect in custody or there was a known sample for comparison.  (See <u>Singer</u> Hearing Tr. (Dkt. No. 17) at 84-87, 95-97, 129)  This policy reflected the fact that – at that time – DNA testing was indefinite, costly, and subject to lengthy delays.  By 2006, however, the technology had evolved such that Detective Tracy knew that once a DNA sample was obtained from Symonds, testing would be expeditious, and "there would [be] definitive proof that [Symonds] either was or was not the donor of the blood [found in Moscatelli's home]." (Petition, Ex. B (Dkt. No. 1-2) (<u>Singer</u> Order) at 32-33)

In sum, the state court's refusal to dismiss the indictment was not contrary to, or an unreasonable application of, "clearly established Federal law."  <u>See</u> 28 U.S.C. § 2254(d)(1). Indeed, courts have recognized that the "tactical advantage requirement is not met merely because a prosecutor 'refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt.'"  <u>Velez</u>, 2017 WL 1288663, at *6 (quoting <u>United States v. Lovasco</u>, 431 U.S. 783, 795 (1977)).

Accordingly, to the extent that Symonds' due process claim is premised on pre-indictment delay, it does not provide a basis for habeas relief.

**B.**    **<u>Sufficiency of the Evidence</u>**

Symonds argues that the evidence at trial was insufficient to prove the charge of second degree murder.  According to Symonds, his conviction rests on "a small sample of blood" with his DNA found in the victim's dining room, and this evidence is not sufficient to support his

conviction. (Petition, Ex. A (Dkt. No. 1-1) (Pet. Br.) at 70) ("The only evidence that connected petitioner to the crime scene was his DNA.")

A habeas petitioner seeking relief on grounds of insufficient evidence must demonstrate that, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); accord Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (nothing that a petitioner "bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence") (citation omitted). Symonds has made no such showing here.

As an initial matter – and as Judge Fox points out – Symonds' conviction rests on more than DNA evidence. (See R&R (Dkt. No. 25) at 17) (summarizing the evidence against Symonds)

As discussed above, Moscatelli's neighbor, Carla Ferrante, overheard Moscatelli say inside his home – less than two hours before his body was found – "Bob, stop hitting me . . . I'll give you whatever you want." (Trial Tr. (Dkt. No. 18) at 296)

And a Rikers Island inmate who had been incarcerated with Symonds in July and August 2009 testified that Symonds had admitted his involvement in the murder. (Id. (Dkt. No. 21) at 1498) Symonds told his fellow inmate that he was "involved in the murder" of a "victim[] name[d] Louis" in 1994, and that the murder "happened because [Symonds] owed his father money." (Id. at 1628-29) Symonds told the inmate that he thought that he could "get away with [the murder,] because the case was so old," and because Symonds had "left [the murder scene] before the cops even got there." (Id. at 1506, 1628)

There was also evidence that Symonds had suffered an injury at about the time of Moscatelli's murder. Ralph Brown – Moscatelli's roommate – testified that, after he found the body and on the evening of the murder, he observed that Symonds had a towel wrapped around his hand – suggesting an injury – and that he was having difficulty walking. (Id. (Dkt. No. 18) at 70-73, 229-30) Symonds Sr. – who was helping Petitioner Symonds to their car – was carrying a "canvas bag," of a type used to "keep knives in." (Id. at 72, 236, 277-78)

Expert testimony indicated that those who engage in this type of vicious assault – which involved a physical struggle and a victim who sustained nearly fifty stab wounds – often unintentionally cut themselves. (Id. (Dkt. No. 19) at 975-76, 978, 972) The expert testimony thus helped explain how Symonds' blood might have wound up in Moscatelli's home at the time of the murder.

As to the DNA evidence, Desire testified that Symonds' DNA was consistent with (1) S3, the blood droplet found in Moscatelli's dining room; (2) blood found on a bathtub mat and a shower curtain in Symonds' bathroom; and (3) blood found on the cement walkway running between Moscatelli's residence and the Symonds' house. (Id. at 884, 1090) Desire further testified that the S3 sample found in Moscatelli's dining room was in the form of a "drop," which "would indicate that somebody bled at that particular spot." (Id. at 821-22) The blood droplet contained in S3 was not in the form of a "smear of blood" or in "boot prints" that would suggest contamination of the crime scene. (See id. at 822, 899) (Desire testifying that S3 "appears to be a drop as oppose[d] to [a] contact pattern" that involved "two objects com[ing] into contact with each other and creating a smear")

In sum, a reasonable jury could have found that Symonds suffered an injury while knifing Moscatelli nearly fifty times; that as a result of that injury, a drop of Symonds' blood fell

on the floor of Moscatelli's dining room; that Symonds continued to bleed while walking from

Moscatelli's home to the Symonds' house; that Symonds continued to bleed while in his

bathroom; and that the towel or cloth Brown saw wrapped around Symonds' hand was intended

to staunch the bleeding resulting from a knife wound.  Viewing the evidence in the light most

favorable to the People, a reasonable jury could have found that Symonds murdered Moscatelli

in his home.  See Jackson, 443 U.S. at 319.

Symonds argues, however, that it was a "reasonable inference[]" that his "blood

was deposited at the crime scene as a result of contamination by police personnel."  (Petition, Ex.

A (Dkt. No. 1-1) (Pet. Br.) at 72)  It was a jury question how Symonds' blood wound up in

Moscatelli's home, however.  Symonds' theory of crime scene contamination was the subject of

extensive testimony, and the possibility of crime scene contamination was fully aired before the

jury.  (See Trial Tr. (Dkt. No. 21) at 1348-50 (defense forensic expert Shiro testifying that

"[t]here is a lot of blood in [Moscatelli's home]," which "presents a danger [of people

contaminating the crime scene]"); id. at 1185-87 (Detective Guedes testifying that no officer

wore protective gear or footwear when entering the victim's house on February 4, 1994); id.

(Dkt. No. 18) at 44-47 (defense counsel arguing in opening that the DNA evidence was not

reliable because police officers had contaminated the crime scene); id. (Dkt. No. 20) at 1912

(defense counsel arguing in closing that "S3 is now shot full of DNA contamination"); id. at

1926-27 (defense counsel arguing that there had been testimony "about . . . people . . . walking

around, stepping all over the place, right in the area where S1, S2, and S3 are"))

The jury nonetheless chose to credit the DNA evidence.  Given (1) the fact that

the S3 blood droplet found in Moscatelli's home matched Symonds' DNA; (2) the evidence

demonstrating that the blood droplet found in Moscatelli's home was not the result of

contamination; and (3) the expert testimony indicating that vicious knife attacks like that

inflicted on Moscatelli often result in the assailant suffering minor wounds, the evidence

supports the jury's finding.

To the extent that Symonds' habeas petition is founded on a theory of insufficient

evidence, the petition will be denied.

### C.    Ineffective Assistance of Counsel

Symonds also alleges ineffective assistance of counsel, complaining that his

lawyer failed to (1) challenge the "chain of custody" of the S3 blood sample; (2) obtain and use

at trial the 1996 accreditation report of the NYPD Laboratory; and (3) move to suppress the

prosecution's evidence.  (Petition, Ex. A (Dkt. No. 1-1) (Pet. Br.) at 91-92)  All these claims

were made in Symonds' CPL § 440.10 motion (see Chariott Decl., Ex. 6 (Dkt. No. 13-7) (Pet.

Section 440.10 Br.) at 1-2, 8-9), and were rejected by Justice Benitez.  (See id., Ex. 9 (Dkt. No.

13-11) (Section 440.10 Order) at 5-7)

An ineffective assistance of counsel claim has two components.  See Strickland v.

Washington, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's

performance was deficient.  This requires showing that counsel made errors so serious that

counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment."  Id.  "Second, the defendant must show that the deficient performance prejudiced

the defense.  This requires showing that counsel's errors were so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable."  Id.

In denying Symonds' CPL § 440.10 motion, Justice Benitez – the trial judge –

noted that defense counsel had "persistently hammered" the "doubt" on whether "[Symonds']

DNA had in fact been compared with the DNA extracted from the crime scene."  (Chariott Decl.,

Ex. 9 (Dkt. No. 13-11) (Section 440.10 Order) at 5-6) (stating that Symonds' lawyer had

"mounted an aggressive, robust, and detailed attack on the serological evidence which the People claimed connected [Symonds] to the murder")  As to chain of custody, defense counsel extensively cross-examined NYPD Detective O'Loughlin about picking up Petitioner's swab of DNA in Florida, flying to New York, securing the swab at the Bronx County District Attorney's Office, vouchering the swab, and transporting the swab to the Medical Examiner's laboratory. (See Trial Tr. (Dkt. No. 19) at 619-27)

        Even if defense counsel's performance was deficient – and there is no evidence that it was – Symonds has not established prejudice, because he has not "show[n] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." Strickland, 466 U.S. at 687.

        As discussed above, the 1996 accreditation report concerning the NYPD laboratory was not relevant, because the blood samples at issue were never sent to the NYPD laboratory.  (Compare Petition, Ex. C (Dkt. No. 1-2) at 59 with Trial Tr. (Dkt. No. 19) at 673 (Detective Lugo testifying that the blood samples were "forwarded" to the "M.E.'s Office for blood analysis"))

        In arguing that his lawyer should have moved to suppress the prosecution's evidence, Symonds does not identify the evidence that should have been suppressed, nor does he provide any basis for suppressing any evidence.

        To the extent that Symonds argues that the blood samples should have been suppressed, there was no basis for moving to suppress this evidence.  The blood samples recovered from the victim's home and a cement walkway outside Symonds' residence do not implicate Symonds' Fourth Amendment rights.  See United States v. Reyes, 283 F.3d 446, 465 (2d Cir. 2002) ("[W]e have found no Fourth Amendment violation based on a law enforcement

officer's presence on an individual's driveway when that officer was in pursuit of legitimate law enforcement business," because "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense.") (citing Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988)); Minnesota v. Carter, 525 U.S. 83, 90 (1998) (a person has no reasonable expectation of privacy in another person's home if he is "only in the home a matter of hours").  Moreover, the bathmat and shower curtain recovered from Symonds' residence, and the DNA sample taken from Symonds, were obtained pursuant to search warrants, the legality of which Symonds does not challenge.  (Trial Tr. (Dkt. No. 19) at 671-73; Singer Hearing Tr. (Dkt. No. 17) at 26-27)

　　　　In sum, Symonds was not prejudiced by his lawyer's failure to move to suppress the blood evidence.

## CONCLUSION

For the reasons stated above, Judge Fox's R&R is adopted, and Symonds's petition for a writ of habeas corpus (Dkt. No. 1-1) is denied.

Because Symonds has not made a substantial showing of the denial of a constitutional right, no certificate of appealability will issue under 28 U.S.C. § 2253(c)(1)(A). This Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for purposes of an appeal. Cf. Coppedge v. United States, 369 U.S. 438, 444-45 (1962) (holding that an appellant demonstrates good faith when he seeks review of a non-frivolous issue). The Clerk of Court is directed to mail a copy of this order to Petitioner and to close this case.

Dated: New York, New York
           September 4, 2024

                              SO ORDERED.

                              Paul G. Gardephe
                              United States District Judge